491 So.2d 641 (1986)
STATE of Louisiana
v.
Earl SMITH.
STATE of Louisiana
v.
Raymond SMITH.
Nos. 85-K-1520, 85-K-1521.
Supreme Court of Louisiana.
July 1, 1986.
Rehearing Denied September 4, 1986.
*642 Robert Zibilich, Dwight Doskey, for defendant-applicant in No. 85-K-1520.
Dwight Doskey, Craft & Doskey, Clyde Merritt, for applicant in No. 85-K-1521.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John Rowley, Dist. Atty., Glenn Diaz, Asst. Dist. Atty., for plaintiff-respondent.
DENNIS, Justice.
Defendants, Raymond Smith and Earl Smith, were each convicted of second degree murder, La.R.S. 14:30.1, by a jury and sentenced to life in prison at hard labor without benefit of probation, parole or suspension of sentence. On appeal, with one judge dissenting, the court of appeal affirmed. State v. Smith and Smith, 470 So.2d 128 (La.App. 4th Cir.1985). This court granted certiorari. 476 So.2d. 337 (La.1985)
Mario Gioe was found dead on January 6, 1983 at 6:20 a.m. by an officer of the St. Bernard Parish Sheriff's Department after responding to a radio message received at 6:11 a.m. The victim was lying face-down by the side of the road near the intersection of East Judge Perez Drive and River Bend Road. His hands were tied behind his back with electrical wire, and he had been shot twice in the back of the head with a Strum Ruger .357 magnum. The victim's pockets had been turned inside out. Near the body was the imprint in the sand from a tennis shoe.
The night before the murder, Gioe had been seen by several witnesses at a local restaurant owned by his family. Early in the evening Gioe received $500 in rent money owed to him by a tenant. At 1:30 a.m. Gioe used the restaurant phone to call his mistress, June Marino. Their conversation lasted about an hour and fifteen minutes. According to Ms. Marino, Gioe told her he would not see her that night because he was going to visit his "whore," Lennie Bordelon, a woman who lived with the defendant, Earl Smith. She testified that Gioe had paid Bordelon to perform oral sex for him several times. Gioe left the restaurant shortly after this telephone conversation at 3:30 a.m. When his body was found by the police at 6:20 a.m. all of his money and jewelry had been removed.
Around 6:00 a.m. on the morning of the murder, Mrs. Marjorie Molero was driving to work on East Judge Perez Drive when a car, driven very fast by a man she later identified as defendant Earl Smith, cut in front of her near the intersection of River Bend Road and East Judge Perez. She looked closely at the man driving the car because she thought it might be her co-worker for whom she often looked while driving to work. She testified that the lighting at the time was "very good" and identified the car as a brown Camaro Z-28, the same model as the victim's car. Mrs. Molero also noticed a light-colored car on the side of the road near where the Camaro had pulled onto the road, but she was unable to describe this car in any greater detail. Later that day the victim's brown Camaro Z-28 was found 2.3 miles from the murder scene devoid of adult fingerprints.
On January 18, 1983, a state police trooper stopped cousins Earl and Raymond Smith in response to a motorist's complaint that the driver of a 1975 Ford Ltd. had waved a gun at him. The trooper asked Raymond Smith, the driver, if he had a gun in the car. When Raymond answered affirmatively and indicated it was beneath *643 the front seat of the car, the trooper removed the gun. The car and the gun belonged to Raymond Smith's mother, Mrs. Doris Smith Staples. She testified that Earl and Raymond repaired the car on January 17, 1983 after towing it to her house from New Orleans where it had broken down on Thanksgiving. Mrs. Staples testified that she had purchased the gun in question over four years ago and had kept it in the car from November, 1982 until Earl and Raymond were stopped by the trooper. This gun was later determined to be the Strum Ruger .357 used to kill Mario Gioe.
Warrants were obtained to search both men's homes. At Earl Smith's home in St. Bernard, on a door lying on the floor of his garage, the police found a partial footprint from a tennis shoe which matched the cast of the tennis shoe print found at the scene of the murder. These prints were the same size as Earl Smith's shoe. However, a 16-year old friend of Earl's testified that he made the print on the door, and his mother testified that she threw the shoes away because they were covered with grease. Also found at Earl Smith's house were 25 to 30 pieces of electrical wire similar to the wire used to bind the victim's hands.
In defense, although not taking the stand himself, Earl Smith offered the testimony of two ferry boat captains on the nearby Chalmette-Lower Algiers run to show that at 6:00 a.m. on the day of the crime the light was insufficient to allow a positive identification by the state's eyewitness, Marjorie Molero. Captain George Clark testified that his log showed that foggy conditions persisted until 8:30 a.m. and that first light had not occurred until thirty minutes prior to sunrise which was 6:57 a.m. Captain Wilbert Norman's log also showed that there was fog and light haze on the morning of the murder.
At Raymond Smith's home in Metairie, police found the box which had contained the murder weapon when it was purchased by his mother. Doris Smith Staples testified she had brought the weapon to Raymond's house after purchasing it in Chalmette and had left the box and warranty there. Testimony by Milton Hayes, a co-worker of Raymond Smith's, indicated that Raymond had possession of the weapon in November, 1982 and had a firearm which resembled it in December of 1982. Doris Smith Staples testified that Raymond had a .357 magnum of his own and had used her weapon only once with her permission for target practice. She also testified at trial that Earl Smith, Raymond Smith and her 18 year old daughter each knew her .357 magnum was kept in her car, which had a defective door that would not lock, and therefore all of these persons had access to the weapon.
Raymond Smith's defense included alibi evidence from his wife, Lynette, and his friend, Chris Gagnon, who testified that they were with Raymond at his home the entire night of January 5 and the morning hours of January 6, 1983. Raymond Smith also took the stand and testified to the same facts.
Raymond Smith and Earl Smith were indicted by a St. Bernard Parish grand jury for the January 6, 1983, first degree murder of Mario Gioe under La.R.S. 14:30. The state subsequently amended the indictment to charge them with second degree murder. La.R.S. 14:30.1. After a trial by jury, both men were found guilty of second degree murder and sentenced to life imprisonment at hard labor. Their convictions and sentences were affirmed on appeal. We granted certiorari and in this case each defendant argued several assignments of error. Because each defendant has at least one meritorious assignment of error, we reverse the convictions and sentences for the reasons hereinafter assigned.
Raymond SmithSufficiency of Evidence
Raymond Smith challenges the sufficiency of evidence to support his conviction. The constitutional guaranties of due process of law require that the prosecution must prove each essential element necessary to convict a person of a crime beyond a reasonable doubt, In re Winship, 397 U.S. 358, 90 S.Ct. 1068; 25 L.Ed.2d 368 *644 (1970) and that the evidence, when viewed in the light most favorable to the prosecution, must afford a basis for a rational trier of fact to find that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781; 61 L.Ed.2d 560 (1979).
The evidence against Raymond Smith does not measure up to the due process standard. The trier of fact in this case reasonably could have found beyond a reasonable doubt that Raymond Smith had possession of the murder weapon one month before the crime and 12 days after the killing. But the evidence does not support a finding beyond a reasonable doubt that Raymond Smith had possession of the weapon at the time of the homicide. Moreover, the evidence does not justify a finding beyond a reasonable doubt that he was present in St. Bernard Parish at the time of the slaying or that he participated in the crime as an absent co-principal. In essence, the evidence suggests the possibility of his implication in the crime, justifying a suspicion or a probable cause finding, but the record does not contain evidence warranting a finding of guilt beyond a reasonable doubt.
The main deficiency in the prosecution against Raymond Smith stemmed from the fact that the state's case focused on Earl Smith as the killer and failed to link the two at the time of or in the act of the homicide. Although the prosecution marshalled convincing evidence linking Earl Smith with the crime, its proof failed to exclude the reasonable possibility that Earl committed the homicide alone or in concert with someone other than Raymond. The murder weapon was a .357 magnum owned by Earl Smith's aunt and kept by her under the front seat of her car. Earl knew before the killing of the existence and location of his aunt's firearm. He could have obtained possession of the weapon without Raymond's help or without Raymond's knowledge that he planned to commit a particular crime. He also could have perpetrated the crime and replaced the weapon without Raymond's knowledge or assistance. There was no evidence that Raymond assisted Earl or that Raymond was in St. Bernard Parish on the night of the crime.
Considering, in addition, that only Earl had a specific motive to kill Mario Gioe and that only Earl was seen departing the site where the body was found soon after the slaying, the evidence simply does not show Raymond's complicity sufficiently to furnish a basis for incriminating him beyond a reasonable doubt. The judgments of the court of appeal and the district court relative to Raymond Smith's conviction and sentence are therefore vacated and he must be discharged. State v. Shapiro, 431 So.2d 372 (La.1982); Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981); Burks v. U.S., 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).
Earl SmithErroneous Denial of Challenge for Cause
Defendant Earl Smith contends that the trial court erroneously overruled his challenge for cause of a prospective juror. The challenge for cause is based on the alleged partiality of Mrs. Decondris, a prospective juror, because she had an opinion or impression as to the guilt of the defendant. See La.C.Cr.P. art. 797(2)
Although Mrs. Decondris initially testified that she understood that the state had the burden of proof and that the defendants did not have to prove anything or take the stand, she later testified that she would have to hear some proof of innocence on behalf of the defendants before she could make a fair decision; that there were some things she had read in the paper that bothered her and put a question in her mind; that if the defense attorneys did not disprove the evidence discussed in the newspaper or prove that the defendants were innocent, the question would remain. As to Raymond Smith, she stated that, if the state failed to show that he was in St. Bernard Parish at the time of the crime and if there was no evidence of his guilt, she would give him the benefit of the *645 doubt. However, as to Earl Smith, she made no such declaration.
Mrs. Decondris testified on voir dire, in pertinent part, as follows:
MR. DIAZ:
Irregardless of that fact whether he lived on Delille Street or not, and whether you may have seen him, do you feel that because you may recognize him that you could not sit on the jury of the two men who are accused of his murder?
MRS. DECONDRIS:
That wouldn't bother me as much as some of the evidence I read in the paper. It left a question in my mind. If I can say the evidence I have read
MR. DIAZ:
No, ma'am, I would rather you not. Not now.
MS. DECONDRIS:
It leaves a question in my mind about the evidence.
MR. DIAZ:
You say you read something in the paper. Does that so taint you that you couldn't give anyone a fair trial?
MS. DECONDRIS:
I could give them a fair trial if they can prove otherwise of that evidence that was in the paper. I have to say, you know, the evidence I read in the paper, it leaves a question in my mind.
MR. DIAZ:
Would it make a difference to you if you read it in the paper and I told you I can prove similar evidence or worse evidence here in court in my opening statement to you?
MS. DECONDRIS:
To tell you the truth, you would have to have proof for me to really get it fairly clear in my mind.
MR. DIAZ:
Do you understand that the State of Louisiana had the burden of proof, and that the defendants don't have to prove anything to you?
MS. DECONDRIS:
Yes, I know that.
MR. DIAZ:
Do you understand that they don't even have to take the stand in their own defense?
MS. DECONDRIS:
Yes.
MR. DIAZ:
They don't have to put up a defense?
MS. DECONDRIS:
Yes.
MR. DIAZ:
They don't have to take the stand, they don't have to put on a witness on the stand. All they have to do is sit there.
MS. DECONDRIS:
Yes, I know that.
* * * * * *
MR. ZIBILICH: (Attorney for Earl Smith)
Ms. Decondris, again nobody here is fighting with anybody. We appreciate your honesty in answering the questions. Would it be fair to say that your answers to the questions I asked that gentleman who just left, your answers would basically be the same?
MS. DECONDRIS:
Yes, I would have to hear some proof of innocence on their part before I can make a fair decision. I would still have to hear that theynot necessarily putting them on the stand, but you lawyers could prove to me they are just as innocent as much the courts are trying to say they are guilty. I mean, that's what I told Mr. Diaz. There are some things I read in the paper puts a question in my mind. I'd like the answers to that to give me a better feeling toward the whole case.
MR. ZIBILICH:
If we didn't prove to you that they are innocent
MS. DECONDRIS:
It would just stick in my mind. The question would still be there. It would be unanswered.
MR. ZIBILICH:
Same motion.

*646 MR. DIAZ:
No questions.
MR. MERRITT: (Attorney for Raymond Smith)
Let me have that last name?
MS. DECONDRIS:
Decondris.
MR. MERRITT:
In spite of what you've read, if it all turns out at the end of the trial, including what you read, and you can't disregard all of the evidence taken from here, if the District Attorney can't put Raymond Smith in this Parish, and there is no evidence as to Raymond Smith, and he rests, would you give him that benefit that is afford him?
MS. DECONDRIS:
I would have to do it.
MR. MERRITT:
If there is no evidence, you would have no problem in finding Raymond Smith not guilty?
MS. DECONDRIS:
I would have to give him the benefit of the doubt.
MR. MERRITT:
I accept Ms. Decondris.
MR. ZIBILICH:
I move to challenge for cause.
MR. DIAZ:
Oppose the challenge for cause.
THE COURT:
The challenge for cause is denied.
Subsequently, defendant exhausted the remainder of his peremptory challenges prior to selection of the jury.
Where an accused has exhausted all of his peremptory challenges before completion of the panel, he is entitled to complain on appeal of a ruling refusing to maintain a challenge for cause made by him. State v. Qualls, 353 So.2d 978 (La. 1977), State v. Ballard, 337 So.2d 481 (La. 1976); La.C.Cr.P. 800.
A defendant need only show two things to obtain a reversal: (1) that the trial judge erred in refusing to sustain a challenge for cause by the defendant; and (2) that the defendant exhausted all of his peremptory challenges. State v. Sylvester, 400 So.2d 640 (La.1981); State v. Allen, 380 So.2d 28 (La.1980); State v. McIntyre, 365 So.2d 1348 (La.1978). (La.C.Cr.P. art. 800 comment (a) But the trial judge is vested with broad discretion in ruling on a challenge for cause, and that ruling will not be disturbed on appeal absent a showing of abuse of discretion. State v. Allen, supra; State v. Drew, 360 So.2d 500 (La. 1978); State v. Sheppard, 350 So.2d 615 (La.1977); State v. Passman, 345 So.2d 874 (La.1977); State v. Weathers, 320 So.2d 895 (La.1975).
Mrs. Decondris initially assented to the abstract conclusion that the state had the burden of proof, but she later revealed that she held an opinion or impression of the defendants' guilt derived from reading newspaper articles which would cause her to place the burden on the defendants to prove their innocence, contrary to the law. When a juror holds such opinion or impression, this constitutes grounds for challenge for cause unless the "juror declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence." La.C.Cr.P. art. 797(2). Mrs. Decondris was never asked to declare whether she could lay aside her opinion or impression of Earl Smith's guilt and render a verdict based on the evidence presented in court. See Irvin v. Dowd, 366 U.S. 717, 724, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961). Hence, she made no declaration that she could lay aside her opinion as to Earl Smith's guilt and the trial court could not have been satisfied reasonably that she could render an impartial verdict according to the law and the evidence. Accordingly, we conclude that the trial court erred manifestly and misused its discretion when it failed to grant defendant Earl Smith's challenge for cause of juror Decondris. The judgments of the court of appeal and the district court relative to Earl Smith's conviction and sentence *647 are vacated and the case remanded to the latter.
Other assignments of error filed by defendant Earl Smith present arguably reversible merit. Because the erroneous denial of the challenge for cause requires reversal, we do not reach the actual merits of the other assignments. Upon retrial, however, in the event the same or similar questions are presented, we note the possibly reversible issues and the authorities by which the trial court should be guided: (1) whether a contemporaneous instruction should accompany the introduction of an impeaching prior inconsistent statement, see State v. Kaufman, 304 So.2d 300 (La. 1974); State v. Ray, 259 La. 105, 249 So.2d 540 (1971); State v. Willis, 241 La. 796, 131 So.2d 792 (1961); (2) whether there was an introduction of inadmissible "other crimes" evidence during the testimony of Earl Smith's neighbor, see State v. Haarala, 398 So.2d 1093 (La.1981); State v. Monroe, 364 So.2d 570 (La.1978); State v. Sutfield, 354 So.2d 1334 (La.1978); Pugh, Louisiana Evidence Law, 30-52; and La.C.Cr.P. art. 770; (3) whether, taken as a whole, the final charge to the jury erroneously instructed the jury that it could not go beyond the evidence to find a reasonable doubt; see State v. Vessell, 450 So.2d 938 (La.1984); State v. McDaniel, 410 So.2d 754 (La.1982); State v. Mack, 403 So.2d 8 (La.1981); State v. Gibbs, 355 So.2d 1299 (La.1978).
REVERSED AND DEFENDANT DISCHARGED AS TO RAYMOND SMITH.
REVERSED AND REMANDED AS TO EARL SMITH.
CALOGERO and WATSON, JJ., concur as to Raymond Smith but dissent as to Earl Smith.
BLANCHE, J., retired, participated in this case ad hoc, in place of COLE, J., the matter having been heard and submitted before Justice COLE replaced Justice BLANCHE on the Court.